IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 13-cv-03091-BNB

TONYA ROWE,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

Defendant.

_____

## ORDER
_____

This action seeks review of the Commissioner's decision denying the plaintiff's claim for

supplemental security income benefits under Title XVI and disability insurance benefits under

Title II of the Social Security Act.  The court has jurisdiction to review the Commissioner's final

decision under 42 U.S.C. § 1383(c)(3).  The matter has been fully briefed, obviating the need for

oral argument.  The decision is AFFIRMED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff filed her applications for benefits on February 2, 2011.  *Social Security*

*Administrative Record* [Doc. #10] (the "Record"), pp. 201-11.[1]  The plaintiff alleged disability

beginning January 20, 2011, due to adult attention deficit disorder ("ADD"), arthritis in her back,

deep vein thrombosis ("DVT"), and chronic venous insufficiency ("CVI").  Id. at pp. 76, 90.

Her applications were denied on June 14, 2011.  Id. at pp. 104-109.  The plaintiff requested a

_____

[1]I refer to the official page numbers of the Record which are found on the lower right-hand corner of each page, not to the page numbers that are assigned by the court's docketing system.

hearing before an Administrative Law Judge ("ALJ").  Id. at pp. 110-11.  The hearing was held

on October 23, 2012.  Id. at p. 29.  On November 6, 2012, the ALJ issued a written decision

finding that the plaintiff was not disabled as defined in the Social Security Act.  Id. at pp. 11-24.

The Appeals Council denied the plaintiff's request for review.  Id. at p. 1.  The ALJ's decision is

final for purposes of this court's review.  20 C.F.R. § 404.981.[2]

On March 8, 2010, the plaintiff was seen at the Wheat Ridge Family Clinic for

medication refills.  She was diagnosed with chronic lower back pain and attention deficit

hyperactivity disorder ("ADHD").  She was prescribed Vicodin and Tramedol for pain and

Adderall for her ADHD.  The care provider documented that the plaintiff was notified of "no

early refills for any reason."  Id. at pp. 353-54.

On April 1, 2010, the plaintiff was seen again at the Wheat Ridge Family Clinic a for a

follow up visit.  She was diagnosed with ADHD, chronic low back pain, and anxiety.  She was

continued on her medications and given Alprazolam (Xanax) for anxiety.  Id. at pp. 351-52.

On April 28, 2010, the plaintiff was seen at the Wheat Ridge Family Clinic for a follow

up visit.  She was diagnosed with ADHD, chronic low back pain, anxiety, and acute knee pain.

She was continued on her medications.  Id. at pp. 349-50.

The plaintiff was seen again at the Wheat Ridge Family Clinic by Mani Shahidi,

Physician Assistant, for prescription refills on June 24, 2010.  The care provider documented that

the plaintiff has a complex history of chronic obstructive pulmonary disease ("COPD"),

depression, anxiety, ADHD, chronic pain syndrom, and chronic back pain; smokes one package

---

[2]All references to the Code of Federal Regulations are to the 2014 edition of part 404, which addresses claims under Title II of the Act.  All cited regulations have parallel citations in part 416, which address claims under Title XVI of the Act.

of cigarettes per week; reports no back pain, no muscle aches, and no joint pain; was in no apparent distress; had good judgment; was confused, anxious, and depressed but had a normal affect; and had normal recent and remote memory.  She was diagnosed with attention deficit disorder without mention of hyperactivity; backache; anxiety; depressive type psychosis; myopathy, unspecified; and obstructive chronic bronchitis without exacerbation.  She was prescribed Adderall, Vicodin, Alprazolam, and medications for bronchitis.  Id. at pp. 345-48.

The plaintiff was seen again for a follow up visit and prescription refill by PA Shahidi on September 2, 2010.  PA Shahidi documented that the plaintiff had a history of ADHD, chronic back pain, and COPD with tobacco abuse; reported no depression or sleep disturbances; was not in apparent distress; had good judgment and a normal mood; was active, alert, and oriented to time, place, and person; and had normal recent and remote memory.  The plaintiff was diagnosed with obstructive chronic bronchitis, without exacerbation; depressive type psychosis; anxiety disorder; backache; myopathy, unspecified; attention deficit disorder without mention of hyperactivity; and insomnia, unspecified.  She was prescribed Alprazolam, Tramadol, Vicodin, Adderall, and Zolpidem (Ambien).  Id. at pp. 342-45.

PA Shahidi saw the plaintiff for a follow up visit on September 30, 2010.  The plaintiff reported muscle aches, joint pain, back pain, pain in her right shoulder, weakness, dizziness, headaches, and depression.  PA Shahidi documented that the plaintiff was obese; was not in any apparent distress; had good judgment and a normal mood and affect; was active and alert; was oriented; and had normal recent and remote memory.  She was diagnosed with insomnia, unspecified; obstructive chronic bronchitis, without exacerbation; depressive type psychosis;

anxiety disorder; backache; myopathy, unspecified; and attention deficit disorder without mention of hyperactivity.  Id. at pp. 339-41.

The plaintiff was seen by PA Shahidi on November 18, 2010, for a follow up visit and viral upper respiratory symptoms.  PA Shahidi noted that although the plaintiff had called requesting early refill of her medications because her house was broken into and her medications were stolen, she was not to receive a refill on her pain medications.  PA Shahidi documented that the plaintiff reported no pain; had good judgment; was confused, anxious, and depressed but had a normal affect; was oriented; and had normal remote and recent memory.  The plaintiff was diagnosed with insomnia, unspecified; anxiety disorder; backache, unspecified; myopathy, unspecified; depressive type psychosis; obstructive chronic bronchitis, without exacerbation; and attention deficit disorder without mention of hyperactivity.  She was prescribed Zolpidem; Vicodin; Alprazolam; and Adderall.  Id. at pp. 336-39.

On January 20, 2011, the plaintiff presented to the Emergency Department at the Swedish Medical Center with a chief complaint of right lower extremity swelling with moderate pain and difficulty walking.  She was not in any acute distress and she did not have any other symptoms.  Record, p. 309.  She had moderate swelling and mild tenderness with a slight limping gait.  Id. at p. 310, 313.  The care provider noted that the plaintiff smoked less than one package of cigarettes per day.  Id. at p. 313.  The plaintiff  was given a sonogram, diagnosed with deep venous thrombosis of her right lower extremity, prescribed Lovenox and Coumadin (anticoagulant medications); and discharged from the Emergency Department on the same day.  Id. at pp. 310-11, 313, 316.  Upon discharge, she reported a pain level of 0 out of 10.  Id. at p. 314.

The plaintiff returned to the Emergency Department for a follow up appointment on January 25, 2011. Id. at p. 303. She presented with a pain level of 2 out of 10. Id. at p. 307. The care provider noted that the plaintiff smokes one package of cigarettes per day. Id. at p. 307. Her coagulation tests were within therapeutic limits. The Lovenox was discontinued and the plaintiff was discharged on Coumadin once a day. She was not experiencing any pain and was in no distress upon discharge. Id. at p. 304-305.

On February 1, 2011, the plaintiff was seen at the Wheat Ridge Family Clinic by PA Shahidi for a follow up visit. PA Shahidi documented that the plaintiff had good judgment; was anxious, depressed, and had an abnormal affect, but was alert and active; was oriented; had normal recent and remote memory; and was without edema in her extremities. She was diagnosed with insomnia, unspecified; acute venous embolism and thrombosis of unspecified deep vessels of lower extremity; anxiety disorder; backache, unspecified; myopathy, unspecified; depressive type psychosis; obstructive chronic bronchitis without exacerbation; and attention deficit disorder without mention of hyperactivity. Id. at pp. 333-35.

On February 16, 2011, the plaintiff was seen by PA Shahidi for a follow up visit. The plaintiff reported that her right leg was swollen and her pain was 9 out of 10. However, PA Shahidi documented that the plaintiff was not in any pain and did not have any swelling in her extremities. PA Shahidi also documented that the plaintiff had good judgment; had a normal mood and affect; was alert and active; was oriented; had normal recent and remote memory; had a positive Homan's sign; and had an irregular gait. She was diagnosed with insomnia, unspecified; acute venous embolism and thrombosis of unspecified deep vessels of lower extremity; anxiety disorder; backache, unspecified; myopathy, unspecified; depressive type

psychosis; obstructive chronic bronchitis without exacerbation; and attention deficit disorder without mention of hyperactivity.  PA Shahidi noted that the plaintiff had DVT of the right leg that was "not improving/repeat doppler venous" ultrasound.  The plaintiff was prescribed Alprazolam and Hydrocodone.  Id. at pp. 329-32.

On February 22, 2011, a follow-up ultrasound showed "no definite DVT in the right lower extremity at this time."  Id. at p. 315.

On March 2, 2011, the plaintiff was seen by PA Shahidi for a follow up visit and right "DVT with edema, tenderness, not improving on oral anticoagulation."  The plaintiff reported depression and fatigue.  PA Shahidi documented that the plaintiff was status-post "DVT with persisting edema and tenderness, Homan's negative" and "referral to vascular surgery mandatory."  PA Shahidi further documented that the plaintiff's medications need to be adjusted "[b]ecause swelling and tenderness are not improving fast enough and because the new Doppler venous study of the lower extremity failed to demonstrate new or undissolved blood clots."  The plaintiff was given the same diagnoses and prescribed Zolpidem and Warfarin.  Id. at pp. 326-29.

On March 15, 2011, the plaintiff saw Dr. Dennis Olson, M.D., for a vascular consultation.  Dr. Olson noted that the plaintiff had "done well from a Coumadin standpoint, but still has swelling and pain in the right lower leg."  He also noted that she was smoking 1 ½ packages of cigarettes per day.  Id. at p. 317.  He diagnosed her with postthrombotic syndrome.  He prescribed a supportive stocking and stated that she would "need to probably wear a good supportive stocking for the rest of her life to prevent any postthrombotic syndrome problems including possible ulcerations at a later date."  He could not measure her for a supportive stocking that day because her leg was swollen.  He directed her to "stay with her leg elevated in

6

bed today and tomorrow and go over to one of the medical supply houses over by her house, which she states there exists and get a supportive stocking after being measured with her leg totally non-swollen." He noted that if she could not get her leg down to normal size, she was to return and he would place her in compressive dressings until the swelling decreased and he could measure her. Id. at pp. 317-19.

The plaintiff was seen on March 16, 2011, by PA Shahidi for a follow up visit. PA Shahidi documented the plaintiff did not have any swelling in her extremities and that compression stockings had been ordered. The plaintiff was given the same diagnoses. Id. at pp. 323-26.

On May 4, 2011, the plaintiff saw Nicole Hoffman, D.O. for a consultative physical examination after applying for disability. Dr. Hoffman stated that the plaintiff was in no apparent distress and was cooperative. The plaintiff presented with arthritis of the back; chronic venous insufficiency; deep venous thrombosis of her right lower extremity; and adult attention deficit disorder. She was taking Alprazolam, Levothyroxing, Hydrocodone, Soma, Adderall, and water pills. The plaintiff reported that her pain was 3 out of 10; she is able to sit for ½ hour, walk for 20 minutes, and stand for 20 minutes at a time; a typical day includes personal hygiene, watching television, and cooking meals; she can make beds, do laundry, vacuum, shop for groceries, dust furniture, and prepare simple meals although it hurts to do it all; and she is able to perform all of her self-care activities.

Dr. Hoffman noted that the plaintiff appeared comfortable throughout the examination; she had a normal and appropriate mood and affect; she was alert and oriented; she was able to remember three of three objects after five minutes; when asked how a dog and lion are alike, she

responded that they both have four legs and are territorial; when asked what "even monkeys fall from trees" means, she responded that "even if you think you have a grip, you can still fall"; compression stockings were on both legs; she had generalized popliteal palpable tenderness in her right lower extremity; she had normal range of motion in her cervical spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles; she had abnormal range of motion in her thoracic and lumbar spine; she was unable to walk on her toes or heels; she had a "fairly antalgic gait"; she did not use assistive devices to walk; she was able to partially bend, squat, and rise from a squatting position; and she was able to rise from the examination chair and table with her hands on the table.  Dr. Hoffman found that the plaintiff could sit for two hours up to five hours in an eight hour day; stand for one hour intervals up to two hours in an eight hour day; walk for 15 minute intervals up to one hour in an eight hour day; "lift and carry as much as someone her age and statu[r]e can carry"; partially bend and squat; hear, speak, and travel independently; do daily self-care activities; and perform repetitive motions with her hands.  Id. at pp. 399-403.

On May 5, 2011, the plaintiff saw Meredith Campbell Psy.D., for a consultative psychiatric examination after applying for disability.  The plaintiff reported that she takes care of her parents at times; she does some house cleaning during the day depending on how her legs and back feel; she makes dinner in the evening; she makes jewelry, crochets, and etches mirrors; it takes longer for her to do chores and activities due to her condition, but she can complete them all; she is able to do laundry, grocery shop, prepare simple meals, vacuum, run errands, and make her bed; she performs all necessary self-care activities every other day; she makes dream catchers; she enjoys leather making; she has a friend who comes to her house and visits; she pays bills and manages money; she smokes ½ to 1 package of cigarettes per day; she does not have

symptoms of depression, mania, or psychosis; she sleeps well; she has some anxiety about her teen-aged sons, managing money, and being a single parent; she denies experiencing panic attacks; the main problem that is keeping her from working is her legs; she is a compulsive cleaner and will clean daily; and she has poor attention, poor follow through, distractibility, difficulty organizing, and she loses things.

Dr. Campbell found that the plaintiff had difficulty sitting, standing, and walking, but was able to sit in a chair without appearing to be in an extreme amount of pain; she was cooperative; her affect was appropriate; her organization and character of speech was clear; her thought processes were organized but slightly slow; and she was oriented.  Dr. Campbell diagnosed the plaintiff with attention deficit disorder and anxiety disorder.  She assigned the plaintiff a GAF of 65.  She stated that the plaintiff would be capable of understanding, remembering, and carrying out short simple instructions with mild difficulties and may have moderate difficulty being able to understand, remember, and carry out more complex instructions; has a mild amount of anxiety based on current situational stressors; her ADD medication helps her to focus; and she would have mild limitations having appropriate interactions with the general public, colleagues, and supervisors.  Id. at pp. 386-90.

On June 7, 2011, Karl Chambers, M.D., the State Agency medical consultant, opined that the plaintiff could lift and/or carry 20 pounds occasionally (cumulatively 1/3 or less of an eight hour day); lift and/or carry 10 pounds frequently (cumulatively more than 1/3 up to 2/3 of an eight hour day); stand and/or walk for four hours with normal breaks; sit for six hours with normal breaks; push and/or pull without limitation; climb ramps and stairs, stoop, kneel, crouch, and crawl occasionally; balance frequently, never climb ladders, ropes, or scaffolds; should

avoid concentrated exposure to extreme heat, extreme cold, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards; and does not have any manipulative, visual, or communicative limitations.  Id. at pp. 84-86.

On June 7, 2011, Mary Ann Wharry, Psy.D., the State Agency mental health consultant, opined that the plaintiff was not significantly limited in her ability to remember locations and work-like procedures; was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions; was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods; was not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; had no social interaction limitations, and had no adaptation limitations.  Dr. Wharry noted that the plaintiff could follow simple instructions; deal with changes in a routine work setting; sustain ordinary routines and make simple work-related decisions; respond appropriately to supervision and coworkers; but must have minimal to no interaction with the general public. Id. at pp. 86-87.

On April 12, 2012, the plaintiff was in a car accident.  She was not wearing a seat belt and sustained an open fracture of her right patella; a right tibia-fibula fracture; three left rib fractures; a scalp laceration; blood loss anemia; and a concussion.  Id. at p. 416.  She underwent surgery for "debridement of bilateral extensive forehead degloving wound"; "repair of complex

bilateral forehead wound"; "repair of left upper eyelid wound"; "intramedullary nailing of right

tibial shaft fracture"; open reduction [and] internal fixation of right open patella fracture"; and

"irrigation and debridement of right open patellar fracture including skin, subcutaneous tissue,

muscle and bone." Id. at p. 459-62.  A CT scan of her cervical spine was negative for fractures

or dislocation.  Id. at p. 469.  The plaintiff was discharged from the hospital on May 1, 2012.  Id.

at p. 416.  Her scalp laceration was healed; her right knee incision was healed; she was

discharged with a knee immobilizer; her pain was "well controlled throughout her rehabilitation

stay"; and she was noted to have a thrombus in her left upper extremity which was unchanged on

repeat ultrasound.  Id. at p. 417.

On May 17, 2012, the plaintiff saw PA Shahidi at the Wheat Ridge Family Clinic.  She

reported muscle aches, joint pain, and back pain, but no muscle weakness or swelling in her

extremities.  She was in no apparent distress; was ambulating normally; had good judgment; was

anxious and depressed but had a normal affect and was active, alert, and oriented; had normal

recent and remote memory; and had limited range of motion but no edema.  She was diagnosed

with anemia; depressive type psychosis; attention deficit disorder without mention of

hyperactivity; fracture of tibia and fibula, upper end, closed; anxiety, unspecified; and insomnia,

unspecified.  She was prescribed Adderall, Hydrocodone; Alprazolam; and Zolpidem.  Id. at pp.

519-23.

On June 13, 2012, the plaintiff was seen in the orthopedic clinic.  Her patella x-ray

"look[ed] good" and  showed a decreased joint effusion and soft tissue swelling.  The doctor

discontinued her knee brace and ordered physical therapy to strengthen her right quadricep

muscle and increase her range of motion.  Id. at pp. 434-35.

11

The plaintiff was seen by PA Shahidi again on June 14, 2012.  She was in no apparent distress; was ambulating normally; had good judgment; had a normal mood and affect; was oriented, alert and active; had normal recent and remote memory; and had limited range of motion but no edema.  She was diagnosed with anxiety; depressive type psychosis; attention deficit disorder without mention of hyperactivity; chronic pain syndrome; chronic venous embolism and thrombosis of unspecified deep vessels of lower extremity; postphlebetic syndrome without complications; backache; and insomnia.  She was prescribed Adderall, Hydrocodone, and Zolpidem.  Id. at pp. 515-19.

On July 11, 2012, the plaintiff was seen in the orthopedic clinic.  She was having difficulty "in getting good flexion of her knee" and the doctor thought it might have been due to "a screw that looks like it may be hitting the articular surface."  The doctor stated that he wanted a consult with the surgeon to "review her x-rays and make a decision if we need to consider some type of early screw removal."  Id. at p. 441.

On July 12, 2012, the plaintiff was seen by PA Shahidi.  She had good judgment; was anxious and depressed but active and alert with a normal affect; was oriented; had normal recent and remote memory; and had limited range of motion but no edema.  She was diagnosed with depressive type psychosis; anxiety; attention deficit disorder without mention of hyperactivity; chronic pain syndrome; postphlebetic syndrome without complications; and insomnia.  She was prescribed Alprazolam, Adderall, Hydrocodone, and Zolpidem.  Id. at pp. 511-15.

The plaintiff attended 12 physical therapy sessions beginning June 19, 2012.  Id. at pp. 404-15.  Her last appointment was July 25, 2012.  She reported that she continued to feel okay and had some tightness but no pain.  She had met all of her therapy goals except for descending

stairs one at a time and understood that she needed to continue with her home exercise program to work toward that goal. She had active range of motion of the right knee of 0-122 degrees and 4+ out of 5 strength. Id. at p. 404.

The plaintiff saw PA Shahidi on August 9, 2012. She reported pain radiating to the legs and buttocks, muscle aches, muscle weakness, and joint pain but no swelling in her extremities. PA Shahidi documented that the plaintiff had good judgment; was anxious, depressed, and had abnormal affect but was active, alert and oriented; had normal remote and recent memory; and had limited range of motion but no edema. She was diagnosed with anxiety; attention deficit disorder without mention of hyperactivity; chronic pain syndrome; chronic venous embolism and thrombosis of unspecified deep vessels of lower extremity; postphlebetic syndrome without complications; insomnia; and essential hypertension, benign. She was prescribed Alprazolam, Adderall, Hydrocodone, Zolpidem, and Lisinopril-Hydrochlorothiazide. Id. at pp. 507-11.

The plaintiff saw PA Shahidi again on September 6, 2012. The plaintiff reported constant pain radiating to the buttocks and to the right foot for more than 12 months, muscle aches, joint pain, back pain, depression, and sleep disturbances. She reported no swelling in her extremities. She was not in any apparent distress; was ambulating normally; had good judgment; was anxious and depressed but had normal affect and was alert and oriented; had normal recent and remote memory; and had 1+ pitting edema bilaterally. She was diagnosed with anxiety; attention deficit disorder without mention of hyperactivity; chronic pain syndrome; chronic venous embolism and thrombosis of unspecified deep vessels of lower extremity; and insomnia, unspecified. She was prescribed Alprazolam, Adderall, Hydrocodone, and Zolpidem. Id. at pp. 503-506.

On October 23, 2012, the plaintiff testified at the ALJ hearing.  Id. at pp. 29-58.  She was 42 years old at the time of the hearing.  Id. at p. 35.  She stated that she is 5'6" and her weight varies from 220 to 250 pounds.  Id. at p. 35.  She smokes "[a]bout a half a pack" and is "trying to cut down and quit."  Id. at p. 43.  She lives in a house with her father, grandfather, and 14 year old twin sons.  Id. at pp. 35-36.

The plaintiff testified that she drives three to four times a day, including trips to the grocery store and to her sons' bus stop.  Id.  Her last job was at Walgreens.  She was terminated from Walgreens in 2009 because of a misunderstanding regarding their family discount policy. Id. at pp. 37-38.  She is not currently working because of the swelling in her leg.  She has to elevate it three times a day to decrease the swelling; she cannot stand for very long; she cannot bend it; and she "can't get down on [her] knee at all."  Id. at pp. 39-40.

The plaintiff has been getting one headache a day since the car accident.  The headache goes away when she takes an Excedrin and lies down for "a little like power nap."  She gets migraine headaches "maybe about two a month" that do not go away.  She has been using a cane since the cast was removed from her leg after the accident. Id. at pp. 40-42.

The plaintiff  takes hydrocodone four times a day which helps with the arthritis in her back and with her leg, but does not help her headaches.  She is on medications for ADD, thyroid, anxiety, and to relax her back muscles before bed time.  Id. at p. 42.  She does not have any side effects from her medications.  She suffers from anxiety when she is "in a space with a lot of people," and she suffers "the anxiety of having to take care of my grandfather and my dad and my boys all at the same time."  She has never been hospitalized because of her anxiety, nor does she attend any kind of therapy.  Id. at p. 43.

14

The plaintiff stated that her pain increases with "[a] lot of standing" and "a lot of walking." Her pain also worsens if she sits too long and when the weather is hot. She testified that she could sit and stand for "a couple of hours" and can walk for half a block. Id. at pp. 44-45. She can lift and carry 10 pounds without any problem. She stated that she has problems with her memory and forgets where she places things. Id. at p. 45. She does not have problems making decisions or getting along with other people. Id. at pp. 45-46. On a typical day, she takes the kids to the bus stop, cleans the house with "a lot of breaks"; and takes care of her father and grandfather. Id. at p. 46. She cooks simple meals for everybody in the house; washes the dishes with sitting breaks "for a moment or two"; does laundry; grooms herself; vacuums with the aid of her cane; pays bills; shops for groceries; makes jewelry, etches mirrors, does leather work with breaks; and takes care of a cat.  Id. at pp. 46-49, 51. The other people in the house do not help with the chores. Id. at p. 49.

When questioned by her attorney, the plaintiff testified that she can sit for two hours only if she elevates both legs above the level of her heart during the two hour time span. Id. at pp. 49-50. She also testified that it hurts her knee and lower back to bend over and pick something off the floor. Id. at pp. 51-52. She testified that it is possible that she has had difficulties with her memory for longer than she has known; she has "a problem" when she reads something because she does "not quite grasp" what she is reading and has to read it two or three times before she understands it; and if something is shown to her, it is easier to understand. Id. at pp. 54-55. She rates the pain in her right leg at 6 ½ to 7 on a scale of 1 to 10 on a normal day while on pain medication and at 10 when she wakes up in the morning and has not yet taken her medication.

15

Id. at p. 56.  The plaintiff testified that she elevates her right leg two or three times a day for 15 to 20 minutes.  Id. at pp. 57-58.

## II.  STANDARD OF REVIEW

Review of the Commissioner's disability decision is limited to determining whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence.  Hamilton v. Secretary of Health and Human Services, 961 F.2d 1495, 1497-98 (10th Cir. 1992); Brown v. Sullivan, 912 F.2d 1194, 1196 (10th Cir. 1990).  Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion.  Brown, 912 F.2d at 1196.  It requires more than a scintilla but less than a preponderance of the evidence. Hedstrom v. Sullivan, 783 F. Supp. 553, 556 (D. Colo. 1992).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).  Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993).  Although a reviewing court should meticulously examine the record, it may not reweigh the evidence or substitute its discretion for that of the Commissioner.  Id.

## III.  THE LAW

A person is disabled within the meaning of the Social Security Act only if his physical and mental impairments preclude him from performing both his previous work and any other "substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2).  "When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability

determination." Campbell v. Bowen, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)). However, the mere existence of a severe impairment or combination of impairments does not require a finding that an individual is disabled within the meaning of the Social Security Act. To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months. See Kelley v. Chater, 62 F.3d 335, 338 (10th Cir. 1995).

The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled:

1. The ALJ must first ascertain whether the claimant is engaged in substantial gainful activity. A claimant who is working is not disabled regardless of the medical findings.

2. The ALJ must then determine whether the claimed impairment is "severe." A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities.

3. The ALJ must then determine if the impairment meets or medically equals in severity certain impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. If the claimant's impairment does not meet or equal a listed impairment, the ALJ must determine whether the claimant has the residual functional capacity ("RFC") to perform his past work despite any limitations.

5. If the claimant does not have the RFC to perform his past work, the ALJ must decide whether the claimant can perform any other gainful and substantial work

17

in the economy.  This determination is made on the basis of the claimant's age,

education, work experience, and RFC.

20 C.F.R. §§ 404.1520(a)-(f).  See also Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir.

1988).

The claimant has the initial burden of establishing a disability in the first four steps of

this analysis.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).  The burden then shifts to the

Commissioner to show that the claimant is capable of performing work in the national economy.

Id.  A finding at any point in the five-step review either that the claimant is disabled or not is

conclusive and terminates the analysis.  Casias v. Secretary of Health & Human Services, 933

F.2d 799, 801 (10th Cir. 1991).

## IV.  ANALYSIS

The ALJ found that (1) the plaintiff meets the insured status requirements of the Social

Security Act through September 30, 2014; (2) the plaintiff has not engaged in substantial gainful

activity since January 20, 2011, the alleged disability onset date; (3) the plaintiff has the

following severe impairments: obesity; post deep venous thrombosis (DVT) with right lower

extremity post-phlebitic syndrome; post right patellar fracture; attention deficit disorder (ADD);

and anxiety; (4) the plaintiff does not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments in 20 C.F.R. 404, Subpart

P, Appendix 1; (5) the plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R.

§§ 404.1567(a) and 416.967(a) except that she needs the ability to stand hourly for five to ten

minutes while remaining on task; she cannot use foot controls on the right; she can only

occasionally climb ramps and stairs, stoop, or crouch and can never climb ladders and scaffolds,

kneel, or crawl; she cannot work at unprotected heights or with moving mechanical parts; and she is limited to work with a maximum SVP of 2; (6) the plaintiff is unable to perform any past relevant work; (7) jobs exist in significant numbers in the national economy that the plaintiff can perform; and (8) the plaintiff has not been under a disability as defined by the Social Security Act from January 20, 2011, through the date of the decision.

The plaintiff claims that the ALJ erred when she (1) failed to give sufficient weight to her direct observation of the plaintiff's condition at the time of the hearing when making her RFC finding, especially with regard to the plaintiff's mental abilities; (2) failed to account for the plaintiff's need to elevate her legs when making her RFC finding; and (3) determined the plaintiff could perform other work in the economy.

## A.  The ALJ's RFC Finding

The plaintiff argues that the evidence of her memory test, low intellectual functioning, GAF score of 65, anxiety, depression, abnormal affect, and mental trauma resulting from the death of her mother[3] "is so significant that the ALJ was required either to assign mental restrictions in [the plaintiff's] RFC or to explain in detail why she did not do so." *Plaintiff's Opening Brief*, p. 15.

The RFC is an assessment of the claimant's ability "to do sustained work-related physical and mental activities in a work setting" for eight hours a day, five days a week, or the equivalent

---

[3]Citing page 414 of the Record, the plaintiff states that she "suffered mental trauma as a result of the death of her mother only four days after she was released from the hospital." *Plaintiff's Opening Brief*, p. 15. Page 414 is a physical therapy progress note. In a footnote at the bottom of the page, the physical therapist stated "Note - Pt's mother died 4 days after the pt left the hospital." There is no documentation on page 414 (or anywhere else in the Record) that the plaintiff suffered any mental trauma as a result of the death of her mother.

thereof.  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *2.  "The RFC assessment

considers only functional limitations and restrictions that result from an individual's medically

determinable impairment or combination of impairments, including the impact of any related

symptoms."  Id. at *1.  A claimant's RFC is at issue only at steps four and five of the sequential

evaluation process.  Id. at *3.

The RFC must address the individual's exertional capacity (limitations and restrictions of

physical strength) and nonexertional capacity (limitations and restrictions that do not depend on

physical strength).  Id. at *5.  When assessing an RFC for an individual with mental

impairments, the ALJ should consider the individual's ability to "understand, carry out, and

remember instructions; use judgment in making work-related decisions; respond appropriately to

supervision, co-workers and work situations; and deal with changes in a routine work setting."

Id. at *6.  An RFC assessment of mental limitations and restrictions "must be expressed in terms

of work-related functions."  Id.

In determining the plaintiff's RFC, the ALJ stated in part:

> The claimant is prescribed relevant psychiatric medications for
> mental symptoms, which weighs somewhat in favor of her
> allegations.  However, the treatment record shows that the
> claimant's psychiatric symptoms are generally well controlled with
> medications.  For example, the most recent treatment notes state
> that the claimant's anxiety was "controlled" with Alprazolem.  Her
> insomnia was "responsive" to Zolpidem medication and her ADD
> was "controlled" with Adderall.  (Ex. 7F/16, 20)  The claimant has
> required little medication adjustment.  She has been prescribed
> essentially the same type and dosage of psychiatric medications
> since prior to her alleged onset date.  This further shows that
> conservative treatment is generally effective.  (EX. 3F; 7F)  The
> claimant's treatment has been routine and conservative.  She
> simply presents for medication refills from her primary care
> physician.  She has never seen any mental health professional.  She

has never tried other treatment modalities such as therapy or counseling.

The objective clinical findings are not particularly adverse. A longitudinal view of the treatment record shows that the claimant presents with an anxious and depressed mood on some occasions, but this finding is intermittent as she has a normal mood and affect on other occasions. She consistently exhibits good judgment, orientation in all spheres, and normal recent and remote memory. (Ex. 3F; 7F) The consultative physical examiner observed a normal mood and affect. The claimant was able to remember 3 of 3 objects after 5 minutes. (Ex. 5F/11)

The detailed findings at the consultative psychiatric examination are relatively benign. The claimant drove herself to the examination. She reported that her medications provided some relief and that her concentration level on ADD medication was "pretty good." Even at the consultative examination, she reported that her main problem was her sore legs, rather than a mental impairment. Otherwise, she reported some situational anxiety and stopping and starting various tasks, although, she would eventually finish each task. The claimant was appropriately dressed, was cooperative, had appropriate affect and facial expression, and had slightly slow but organized thought process. On memory testing, she remembered 2 items immediately, although only 1 item after 5 minutes. The claimant had some apparent difficulty with fund of information and calculation tasks. The examiner questioned the possibility of borderline to low-average intellectual functioning, although no formal testing [was] done and the claimant has performed semi-skilled work in the past. **The undersigned considered these adverse findings in limiting the claimant to unskilled work.** The examiner diagnosed ADD and anxiety disorder and assessed a Global Assessment of Functioning (GAF) score of 65. A rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. (See, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision pg. 34, 2000).

* * *

Consultative psychological examiner, Meredith M. Campbell, Psy.D., opined that the claimant could understand, remember, and carry out short simple instructions with mild difficulties and would have moderate difficulties for more complex instructions. Dr.

21

Campbell believed the claimant capable of managing her own funds and to exercise appropriate judgment in doing so. Dr. Campbell assessed that the claimant would only have mild limitations in interacting appropriately with the general public, colleagues, and supervisors. (Ex. 4F) The undersigned gives this opinion great weight. Dr. Campbell's opinion is consistent with the detailed objective findings at this examination as well as a longitudinal view of the treatment record and the claimant's own statements as to effectiveness of her medications.

State agency psychological consultant, Mary Ann Wharry, Psy.D., opined that the claimant had mild restrictions in activities of daily living and maintaining social functioning with moderate difficulties in maintaining concentration, persistence, or pace. (Ex. 3A) Dr. Wharry opined that the claimant could follow simple instructions, sustain ordinary routines, make simple work-related decisions, respond appropriately to supervision and co-workers, but must have minimal to no interaction with the general public. She could deal with changes in a routine work setting. (Ex. 3A) The undersigned gives this opinion significant weight as it is generally consistent with the claimant's symptoms and objective findings. However, the record as a whole does not support the limitation regarding the general public. The consultative examiner's assessment did not support this and the claimant's conditions are well controlled. The claimant goes grocery shopping with no reported mental difficulties.

*Record*, pp. 19-20, 22 (emphasis added).

Thus, contrary to the plaintiff's argument, the ALJ considered and discussed in detail the plaintiff's mental limitations and restrictions expressed in terms of work-related functions. The ALJ specifically stated that she considered those limitations in determining that the plaintiff is limited to performing unskilled work.

The plaintiff also argues that the ALJ erred by failing to give sufficient weight to the plaintiff's abnormal affect and her "markedly unsuccessful" "efforts to remember events during her counsel's examination" during the hearing.[4]   *Plaintiff's Opening Brief*, pp. 14-15.

"[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  SSR 96–7p, 1996 WL 374186 at *2.  In addition to the objective medical evidence, the ALJ must consider other factors when assessing the credibility of an individual's statements, including:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

---

[4]My review of the hearing transcript does not reflect an abnormal affect or a "markedly unsuccessful" effort to remember events by the plaintiff.  To the contrary, the plaintiff responded appropriately to the ALJ's extensive questioning.  *Record*, pp. 35-49.

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *3.

"In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible." Id. at *4.

Here, the ALJ found that the plaintiff was not fully credible. *Record*, p. 17. The ALJ specifically stated that the treatment records showed that although the plaintiff on some occasions presented with an anxious and depressed mood, she had a normal mood and affect on other occasions and consistently exhibited good judgment, orientation in all spheres, and normal recent and remote memory. The ALJ also noted that the consultative physical examiner observed a normal mood and affect and that the plaintiff was able to remember 3 of 3 objects after 5 minutes. The ALJ detailed how the plaintiff's mental symptoms were well controlled with medications and noted that the plaintiff has never seen any mental health professional for her symptoms and has never pursued treatment modalities other than her medications (such as therapy or counseling). In addition, the ALJ discussed in detail the plaintiff's ability to perform a variety of activities of daily living and concluded that those activities suggest significant mental functional ability. *Record*, p. 21. The ALJ's credibility analysis complies with SSR 96–7p and is supported by substantial evidence in the record.

The plaintiff also argues that the ALJ erred because her RFC determination failed to consider the plaintiff's need to elevate her legs "contrary to overwhelming evidence." *Plaintiff's Opening Brief*, p. 15. However, the ALJ specifically considered the plaintiff's claim that she had to elevate her legs several times a day and found the claim not credible because it was not supported by the Record. *Record*, pp. 16, 21. The Record shows that on March 15, 2011, Dr. Olson directed the plaintiff to elevate her leg so that he could properly measure her for a supportive stocking. The Record does not contain any other directives (or even suggestions) that the plaintiff must elevate her leg several times a day. The ALJ also discussed the plaintiff's symptoms, treatment, the effectiveness of the treatment, the objective clinical findings related to the plaintiff's DVT, and the plaintiff's ability to perform activities of daily living consistent with physical functional ability. Thus, the ALJ's credibility determination regarding the plaintiff's need to elevate her legs is in compliance with the law and is supported by substantial evidence in the record.

## B.   The ALJ's Determination that the Plaintiff can Perform Work

The plaintiff's final argument consists of one paragraph. She states that "[t]he ALJ's determination that [the plaintiff] could perform other work in the economy was based on a wrong legal standard and not supported by substantial evidence." *Plaintiff's Opening Brief*, p. 16. The plaintiff states that the ALJ relied on the testimony of a vocational expert who was "not apprised of all of [the plaintiff's] work-related functional limitations. The plaintiff does not identify which limitations were omitted, how the omission was legally flawed, or why the omission was unsupported by the evidence. The argument is vague and conclusory, and I will not address it. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1161 (10th Cir. 2012) (declining to consider the

claimant's poorly developed arguments and stating "[w]e will consider and discuss only those of her contentions that have been adequately briefed for our review").

I have reviewed the entire record, and I find that the ALJ applied the correct legal standards and that her decision is supported by substantial evidence in the record.  I find no error in the ALJ's decision.

IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

Dated January 12, 2015.

BY THE COURT:

 s/ Boyd N. Boland                         
United States Magistrate Judge